## RATHBUN v. UNITED STATES.

No. 30.    Argued October 29, 1957.—Decided December 9, 1957.

*Thomas K. Hudson* argued the cause and filed a brief for petitioner.

*John F. Davis* argued the cause for the United States.    With him on the brief were *Solicitor General Rankin, Assistant Attorney General Olney* and *Beatrice Rosenberg.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This case concerns the issue of whether the contents of a communication overheard on a regularly used telephone extension with the consent of one party to the conversation are admissible in federal court.[1]    Petitioner was convicted of violations of 18 U. S. C. § 875 (b) and (c)

---

[1] The grant of certiorari was limited to the following question, as phrased by petitioner: "Is the listening in of third parties on an extension telephone in an adjoining room, without consent of the sender, an interception of a telephone message, and the divulgence of the contents of such conversation prohibited by statute, to wit Sec. 605, Title 47, U. S. C. A." Implicit in this phrasing of the question is the fact that one party to the conversation did consent.

for transmitting an interstate communication which threatened the life of one Sparks in order to obtain from him a stock certificate which Sparks held as collateral for a loan. On March 16, 1955, petitioner, who was in New York, spoke by telephone with Sparks, who was in Pueblo, Colorado. Anticipating another call from petitioner, Sparks requested that members of the Pueblo police force overhear the conversation. When petitioner phoned Sparks in the early morning of March 17, two police officers at Sparks' direction listened to the conversation on a telephone extension in another room of the Sparks home. This extension had not been installed there just for this purpose but was a regular connection, previously placed and normally used. At the trial the police officers testified over timely objection that during this conversation petitioner had threatened Sparks' life because he would not surrender the certificate. Petitioner was convicted and the Court of Appeals affirmed. 236 F. 2d 514. We granted certiorari. 352 U. S. 965.

*Benanti* v. *United States, ante,* p. 96, determined that information obtained and divulged by state agents in violation of Section 605 of the Federal Communications Act[2] is inadmissible in federal court. The pertinent portion of Section 605 states:

"... no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person ...."

Since there was a divulgence of the contents of a communication, the only issue on the facts before us is whether there has been an unauthorized interception within the meaning of Section 605.[3] The federal courts have split in

[2] 48 Stat. 1103, 47 U. S. C. § 605.

[3] We do not decide the question of whether § 605 is violated where a message is intercepted but not divulged since the police officers did

their determination of this question. Some courts have held that the statute proscribes the use of an extension telephone to allow someone to overhear a conversation without the consent of both parties.[4]  Others have concluded that the statute is inapplicable where one party has consented.[5]  We hold that Section 605 was not violated in the case before us because there has been no "interception" as Congress intended that the word be used.  Every statute must be interpreted in the light of reason and common understanding to reach the results intended by the legislature.  Cf. *Holy Trinity Church* v. *United States,* 143 U. S. 457; *American Security & Trust Co.* v. *Commissioners,* 224 U. S. 491.  That principle would be violated if we attributed to Congress acceptance of the results that would occur here from the position argued by petitioner.

The telephone extension is a widely used instrument of home and office,[6] yet with nothing to evidence congressional intent, petitioner argues that Congress meant to

divulge the contents of the overheard conversation when they testified in court.  Cf. *Benanti* v. *United States, ante,* p. 96.

[4] *United States* v. *Polakoff,* 112 F. 2d 888; *James* v. *United States,* 89 U. S. App. D. C. 201, 191 F. 2d 472; *United States* v. *Hill,* 149 F. Supp. 83; see *Reitmeister* v. *Reitmeister,* 162 F. 2d 691.

[5] *United States* v. *White,* 228 F. 2d 832; *Flanders* v. *United States,* 222 F. 2d 163; *United States* v. *Sullivan,* 116 F. Supp. 480, affirmed, 95 U. S. App. D. C. 78, 219 F. 2d 760; *United States* v. *Lewis,* 87 F. Supp. 970, reversed on other grounds, *Billeci* v. *United States,* 87 U. S. App. D. C. 274, 184 F. 2d 394; cf. *Rayson* v. *United States,* 238 F. 2d 160; *United States* v. *Bookie,* 229 F. 2d 130; *United States* v. *Pierce,* 124 F. Supp. 264, affirmed, 224 F. 2d 281.

[6] For example, in 1934 the Bell Telephone System, including affiliates, had 1,315,000 extension telephones out of a total of 13,378,000. In 1956 the System had 8,465,000 extension telephones out of a total of 50,990,000.  Exhibit 1364 of the Federal Communications Commission Special Telephone Investigation; Federal Communications Commission, "Statistics of the Communications Industry in the United States for the year ended December 31, 1956."

place a severe restriction on its ordinary use by subscribers, denying them the right to allow a family member, an employee, a trusted friend, or even the police to listen to a conversation to which a subscriber is a party. Section 605 points to the opposite conclusion. Immediately following the portion quoted above, the statute continues:

> ". . . no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto . . . ."

The clear inference is that one entitled to receive the communication may use it for his own benefit or have another use it for him. The communication itself is not privileged, and one party may not force the other to secrecy merely by using a telephone. It has been conceded by those who believe the conduct here violates Section 605 that either party may record the conversation and publish it.[7] The conduct of the party would differ in no way if instead of repeating the message he held out

---

[7] See *United States* v. *Polakoff,* 112 F. 2d 888, 889:

"We need not say that a man may never make a record of what he hears on the telephone by having someone else listen at an extension, or, as in the case at bar, even by allowing him to interpose a recording machine. *The receiver may certainly himself broadcast the message as he pleases,* and the sender will often give consent, express or implied, to the interposition of a listener." (Emphasis added.)

Note also that the regulations of the Federal Communications Commission which control the recording of telephone conversations presuppose that either party may record a conversation and declare that tariff regulations of telephone companies which bar the use of recording devices are unjust and unreasonable and so in violation of § 201 of the Federal Communications Act. *In the Matter of Use of Recording Devices in Connection with Telephone Service,* 11 F. C. C. 1033, 1053.

his handset so that another could hear out of it. We see no distinction between that sort of action and permitting an outsider to use an extension telephone for the same purpose.

The error in accepting petitioner's argument is brought into sharper focus by the fact that Section 605 is penal in nature, the first violation being punishable by a fine of not more than $10,000 or by imprisonment for a term not exceeding one year, or both.[8] For example, it follows from petitioner's argument that every secretary who listens to a business conversation at her employer's direction in order to record it would be marked as a potential federal criminal. It is unreasonable to believe that Congress meant to extend criminal liability to conduct which is wholly innocent and ordinary.

Common experience tells us that a call to a particular telephone number may cause the bell to ring in more than one ordinarily used instrument. Each party to a telephone conversation takes the risk that the other party may have an extension telephone and may allow another to overhear the conversation. When such takes place there has been no violation of any privacy of which the parties may complain. Consequently, one element of Section 605, *interception,* has not occurred.

*Affirmed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE DOUGLAS joins, dissenting.

Although this Court had, in *Olmstead* v. *United States,* 277 U. S. 438, decided that neither the Fourth Amendment nor the general judicial principles governing criminal trials in United States courts barred evidence

---

[8] 48 Stat. 1100, 47 U. S. C. § 501. Additional violations are punishable by the same fine and not more than two years' imprisonment, or both.

obtained through interception of telephone communications by law-enforcing officers without the consent of the sender, the Congress a few years later provided that

> "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person . . . ." § 605, Federal Communications Act of June 19, 1934, 48 Stat. 1064, 1104, 47 U. S. C. § 605.

If the judicial attitude that lies behind the phrase "strict construction of a statute," *i. e.,* in favor of an accused, can have an emphatic illustration, it is found in the two *Nardone* cases, in which the quoted provision of § 605 was first given effect by this Court. We there held that the implications of that section bar even the most relevant and persuasive evidence obtained, without a sender's authorization, through interception by law officers, and likewise bar independently secured evidence obtained as a result of leads afforded by such interception. *Nardone* v. *United States,* 302 U. S. 379; 308 U. S. 338. The whole point of the vigorous dissent in the first *Nardone* case was directed against literal application of the phrase "no person" thereby "enabling the most depraved criminals to further their criminal plans over the telephone, in the secure knowledge that even if these plans involve kidnapping and murder, their telephone conversations can never be intercepted by officers of the law and revealed in court." Mr. Justice Sutherland, dissenting in *Nardone* v. *United States,* 302 U. S., at 385. The Court's opinion gave a short and decisive answer: "We nevertheless face the fact that the plain words of § 605 forbid anyone, unless authorized by the sender, to intercept a telephone message, and direct in equally clear language that *'no person'* shall divulge or publish the message or its substance to 'any person.' " 302 U. S., at 382.

In this case, petitioner's conviction was based on the testimony of a police officer who listened in on a telephone communication made by petitioner, and such listening-in was not "authorized by the sender," to wit, the petitioner. It is suggested that the interception, for such it was, in the clear meaning of the term for carrying out its function—an intrusion by way of listening to the legally insulated transmission of thought between a speaker and a hearer—does not fall within the prohibition of § 605, because it was carried out by means of "a regularly used telephone extension with the consent of one party." But, surely, the availability of a "regularly used telephone extension" does not make § 605 inoperative. The fact that the Court relies on "the consent of one party" evidently implies that it would not be without the purview of § 605 for a police officer to conceal himself in a room of a house or a suite of offices having several "regularly used telephone extensions" and surreptitiously to utilize such an extension to overhear telephone conversations.

It is said that the overhearing in this case was "with the consent of one party." But the statute is not satisfied with "the consent of one party." The statute says "no person not being authorized by the sender." Since this Court, in *Nardone,* read "no person" to mean no person, it is even more incumbent to construe "sender" to mean sender, as was the petitioner here, and not to read "sender" to mean one of the parties to the communication, whether sender or receiver. It is further suggested that Congress must have been aware of the wide use of telephone extensions and the practice of listening-in on extensions. In the first *Nardone* case this Court rejected the argument that Congress had knowledge of the employment of federal agents "to tap wires in aid of detection and conviction of criminals." 302 U. S., at 381. But the Court refused to qualify the rigorous policy of Congress as expressed by its enactment. And today, in *Benanti* v.

*United States,* the Court rejects, and if I may say so rightly, the plausible contention that the well-known legislative authorization of wire-tapping by some of the States ought to be deemed to have qualified the strict purpose of Congress.

It is suggested, however, that it is one of the accepted modes of carrying on business in our time to have secretaries listen in on conversations by their principals. A secretary may fairly be called the employer's *alter ego.* And so, a secretary is fairly to be deemed as much of an automatic instrument in the context of our problem as a tape recorder. Surely a police officer called in to facilitate the detection of crime is not such an *alter ego.* His participation in telephone communications when not authorized by the sender occupies precisely the same position that it occupied in the *Olmstead* case when this Court sanctioned the practice, and in the *Nardone* cases where this Court rigorously enforced the prohibition by Congress of what theretofore was a lawful practice.

Sharing the views expressed by Judge Learned Hand in *United States* v. *Polakoff,* 112 F. 2d 888, and *Reitmeister* v. *Reitmeister,* 162 F. 2d 691, I would reverse the judgment.