## The UNITED STATES

v.

**Dean K. FELTON, Nancy E. Bruce, John Zorak a/k/a Johnny, Anthony Serrao a/k/a Buddy, Richard Cox a/k/a Ricky, James Thurman, John Hathorne.**

### Appeal of UNITED STATES of America.

### No. 84–3398.

United States Court of Appeals, Third Circuit.

Argued Dec. 7, 1984.

Decided Jan. 8, 1985.

As Amended Jan. 15, 1985.

---

J. Alan Johnson, U.S. Atty., Paul J. Brysh (argued), and Constance M. Bowden, Asst. U.S. Attys., Pittsburgh, Pa., for appellant.

Stephen M. Sokol, Pittsburgh, Pa., for appellee Richard Cox.

Charles F. Scarlata (argued), Pittsburgh, Pa., for appellee Anthony Serrao (sometimes referred to in court papers as "Serraro").

Before ALDISERT, Chief Judge, BECKER, Circuit Judge, and STERN, District Judge.[*]

## OPINION OF THE COURT

ALDISERT, Chief Judge.

A number of defendants are named in a ten-count indictment charging a conspiracy to possess with intent to distribute marijuana and various associated charges, including performance of overt acts in furtherance of the conspiracy. During the pendency of the conspiracy, Dean Felton, one of the defendants, tape recorded certain telephone conversations that he had with two co-defendants, Anthony Serrao and Richard Cox, without their knowledge. The police now possess these tapes. This appeal by the government from the trial court's order, 592 F.Supp. 172, suppressing the re-

[*] Honorable Herbert J. Stern, of the United States District Court for the District of New Jersey, sitting by designation.

corded conversations of Serrao and Cox requires us to decide whether introducing the contents of these recordings as evidence constitutes an unreasonable invasion of appellees' legitimate expectation of privacy in the conversations. We find no such protected interest, and therefore reverse the order of the district court.

## I.

The facts are not in dispute. Felton owned three houses in Salt Lake City, Utah, that were managed by Quality Properties, a Utah real estate company. Nancy Bruce, one of the co-defendants and ostensibly a friend of Felton, requested Robert Fleming, president of Quality, to search one of Felton's houses for the purpose of locating some clothing left there by her. Quality subsequently located the clothing in a storage area on one of the properties and in a storage space that Quality Properties had rented in Felton's name.

Thereafter, state law enforcement officers advised Fleming that Felton was under investigation for narcotics activities. On February 17, 1982, Fleming and one of his employees, Loren Woods, went to the storage area to look for Bruce's clothing. Two officers of the Utah attorney general's office accompanied Fleming and Woods. While examining the storage areas in Felton's home, Woods found marijuana and certain tape recordings, which he turned over to the Utah authorities. The Utah authorities then turned the tapes over to the Pittsburgh authorities. Without obtaining a warrant, Pittsburgh law enforcement agents played the tapes. This investigation revealed that these tapes included recordings of two telephone conversations made by Felton; one, between Felton and Cox; the other, between Felton and Serrao. Cox and Serrao successfully moved to suppress the recordings in district court.

The district court ruled that the searches of the storage areas were private searches conducted by the owner's real estate manager and not by government agents. The court made detailed findings of fact supporting its conclusion that these private searches did not offend the fourth amendment. The government does not contest this ruling. The district court, however, also held that in the absence of a search warrant the government agents were not permitted to listen to the tape recordings or introduce their contents in evidence. Therefore, the court suppressed the contents of the tape recordings and the fruits thereof. The government has appealed the suppression order. We have jurisdiction over this appeal pursuant to 18 U.S.C. § 3731.

## II.

In granting the suppression order, the district court reasoned "that the defendant Serrao had an expectation that the underlying *phone conversation* would be private, and, while he assumed the risk that the party in whom he was confiding was an informant or would turn information over to the government, Serrao did not assume the risk that the government would listen to the conversation under circumstances that were in violation of his Fourth Amendment rights." 592 F.Supp. at 194. The court's ruling applied to defendant Cox as well. *See* app. at 99a.

The district court primarily relied on *United States v. Jacobsen*, — U.S. —, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Moreover, the district court also concluded that the government "had even less cause to listen to the tape than the government had in viewing the films which was found to be an unreasonable search in the analogous case of *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980)." 592 F.Supp. at 194. For reasons we discuss later, we are of the view that neither *Jacobsen* nor *Walter* controls. Rather, we look to the main body of settled law regarding recorded conversations and expectations of privacy under the fourth amendment.

## III.

At the outset, we must make one point clear. Before us, the government insists on phrasing our inquiry in terms of defendants' "standing" to invoke the fourth

amendment. Yet, we are instructed that in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court "abandoned a separate inquiry into a defendant's 'standing' to contest an allegedly illegal search in favor of an inquiry that focused directly on the substance of the defendant's claim that he or she possessed a 'legitimate expectation of privacy' in the area searched." *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). Conforming to this direction, we have decided this case on the basis of this expectation rather than on "standing."[1]

## IV.

We begin our inquiry with the cases discussing recorded conversations, the evidence at issue in this case. We have the uneasy feeling that the district court, faced with an array of pre-trial motions from seven defendants that covered a plethora of subjects, did not have the benefit of the extensive briefing developed by the government in this appeal on this one issue. We are convinced that, in an abundance of conscience to protect the doctrine of privacy, the district court believed that this case constituted an exception to our seminal decision of *United States v. Mitlo,* 714 F.2d 294, 296 (3d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983), wherein we stated: "Where one party to the conversation consents to the electronic monitoring, the conversation is admissible." As a matter of policy we are unwilling to engraft the exception proposed by the dis-

trict court. We perceive that no distinction should exist in the law when one of the parties to the conversation makes a tape recording of a telephone conversation instead of utilizing an electronic monitoring device, or radio transmitter, *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), or when that party makes the tape on his own initiative instead of doing it at the behest of a government agency.

■ The law generally is settled in this area. We believe that this case presents facts only slightly varied from factual scenarios contained in hefty and hearty precedents. If the fourth amendment does not protect a party to a conversation who reposes a trust or confidence in an undisclosed government agent or informant, *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), we cannot see how the expectation of privacy arises when the recording of a conversation is made by his own confederate. The notion that there is "honor among thieves" has no legal or factual basis. The Supreme Court has stated that "[n]either this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Id.* at 302, 87 S.Ct. at 413.

■ The cases support this rationale. The fourth amendment is not infringed when an undisclosed federal agent simulta-

---

**1.** [T]he question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in *Jones* [*v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) ] and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry un-

der either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in *Jones* also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks. 362 U.S. at 261, 263, 265, 80 S.Ct. at 731, 732, 733.
*Rakas v. Illinois,* 439 U.S. 128, 138–39, 99 S.Ct. 421, 427–28, 58 L.Ed.2d 387 (1978) (footnote omitted).

neously records a conversation with an electronic recording device on his person, *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), or when the conversation is transmitted electronically to a remote place where it is overheard and recorded, *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (plurality opinion); *On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), or where one party to the conversation permits a third party to listen on an extension, *Rathbun v. United States*, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957). Chief Justice Warren appears to have offered a terse explanation of why there can be no expectation of privacy in such conversations: "The communication itself is not privileged, and one party may not force the other to secrecy merely by using a telephone." *Id.* at 110, 78 S.Ct. at 163.

## V.

■ Although the facts before us differ slightly than those in the foregoing cases, the issue can be posed in a single question. If it is conceded that one party to a telephone conversation has no expectation of privacy protected by the fourth amendment when the other party, or listener, is a police informer who deliberately turns over a tape recording to the police, does it make any difference in terms of privacy expectations if the other party, by negligence, inadvertence, or otherwise, permits a tape recording, surreptitiously prepared by him, to come into lawful police possession? We do not think so.

How the tapes came into lawful police possession is immaterial to the overarching question of privacy expectations. Insofar as the fourth amendment is concerned, one party to a telephone conversation assumes the risk that the other party (a) will permit a third party to eavesdrop on an extension telephone, for the purpose of communicating what he heard to the police, or (b) may be a police informer who will relate or record or transmit the conversation to the authorities, or (c) may record the conversation and deliberately turn it over. If the expectation of privacy is not present in premeditated and deliberate actions of the other party, that expectation cannot be said to be present when the communication to police authorities results from the other party's less premeditated conduct.

The expectation of privacy is not measured by what takes place during or after the conversations, but it is measured by what is expected before the conversation begins. The cases seem to say uniformly, in the language of the streets, "When you pick up that phone and talk, you can't trust nobody, nohow, nowhere!"

At bottom then, we return to the seminal case of *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), which quoted with approval Justice Brennan's statement in *Lopez v. United States*, 373 U.S. 427, 465, 83 S.Ct. 1381, 1401, 10 L.Ed.2d 462 (1963) (Brennan, J., dissenting): " 'The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak.' " *Id.* at 303, 87 S.Ct. at 414. Cox and Serrao misplaced a confidence in Felton. They believed that the person to whom they voluntarily confided their statements directly or indirectly would not cause them to be disclosed. They were wrong, because Felton violated their confidences. He did not shout it from the rooftops, or into a microphone, nor did he make a beeline to the police station. Yet, he recorded the conversations and stored the tapes in such a manner that they could come into the possession of third parties, including the police.

## VI.

Rather than militating against the government, the principal case relied on by the district court, *United States v. Jacobsen*, ——— U.S. ———, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), appears to support the

result we reach. In *Jacobsen,* a Drug Enforcement Administration agent examined a package after a private search by Federal Express employees revealed the presence of what they believed was cocaine. In upholding the agent's search, the Supreme Court delineated the distinction between "searches" and "seizures" as used in the text of the fourth amendment: "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.* at ——, 104 S.Ct. at 1655–57 (footnotes omitted).

 The district court seems to have recognized this distinction. It correctly found no difficulty with the actual receipt of the tape recordings by the government officials after they were found by a private individual who had authority to enter and search the owner's premises. As in *Jacobsen,* here "the initial invasions ... were occasioned by private action." Id. Thus, there was no improper "seizure" of the tapes in the fourth amendment sense. And the district court so held. Our inquiry then moves from the seizure of the tapes to the "search" occasioned by their playing. Here we must decide whether there was an infringement of "an expectation of privacy that society is prepared to consider reasonable." *Id.* And here, too, we think *Jacobsen* provides the answer:

> It is well-settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information. Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information: "This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the in-

formation is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in a third party will not be betrayed." *United States v. Miller,* 425 U.S. 435, 443, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1975). The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated. *Id.* at ——, 104 S.Ct. at 1658–59 (footnote omitted). Accordingly, because appellees' privacy expectations were frustrated by Felton's taping of the conversations, the fourth amendment is not implicated.

Nor do we perceive that *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), commands another result, although superficially its facts may appear similar to those before us. *Walter* involved the misdelivery of several packages containing films depicting homosexual activities. After notifying the FBI as to the nature of the films, FBI agents viewed the films without obtaining a warrant. The Supreme Court reversed the lower court, holding that the viewing of the films was an unreasonable search. In *Walter,* the authorities had lawful possession of the films; here, they had lawful possession of the tapes. At this point, however, the similarity between the two cases ends. In *Walter,* the expectation of the film *owner's* privacy was at stake, the plurality opinion stating, "that the unauthorized exhibition of the films constituted an unreasonable invasion of their *owner's* constitutionally protected interest in privacy." *Id.* at 654, 100 S.Ct. at 2400 (emphasis supplied). Earlier, the plurality opinion specifically adopted Justice Stewart's concurrence in *Stanley v. Georgia,* 394 U.S. 557, 569, 89 S.Ct. 1243, 1250, 22 L.Ed.2d 542 (1969), expressing the view that "the warrantless projection of motion picture films was an unconstitutional invasion of the privacy of the *owner* of the films." 447 U.S. at 653, 100 S.Ct. at 2399 (emphasis supplied). Significantly, the justices concurring in the

opinion did not contest this concept. *See id.* at 660–62, 100 S.Ct. at 2403–04.

In the case before us, however, we do not have the expectation of the tape recordings' owner.[2] This is a crucial distinction. What we do have is the expectations of the two men, Cox and Serrao, whose voices were recorded by the owner of the tapes. We consider Cox and Serrao to be in the same position as the actors who performed in the films depicting homosexual activities in *Walter.* By no stretch of the imagination can we suggest that actors who perform before a camera have an expectation of privacy in terms of the fourth amendment. Even though Cox and Serrao did not converse with Felton with a subjective expectation of having their conversation made public, we think that their voices objectively deserve no higher protection than that which would be afforded the actors in the *Walter* films. Although Felton, *qua* owner, had a reasonable expectation of privacy in these tapes, the speakers on the other end of the line, Cox and Serrao, did not. They spoke at their own risk.

## VII.

We hold that the district court erred in suppressing the playing of the recorded statements against Cox and Serrao. We will reverse the judgment of the district court and remand this case for further proceedings in accordance with the foregoing.

---

2. In the proceedings below the court suppressed the playing of the tapes as evidence against Felton, their owner. The government has not appealed that decision.